FILED & JUDGMENT ENTERED
Steven T. Salata

May 08 2012

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

Laura T. Beyer
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

In re:                                  )
                                        )
**GERALDINE DICKENS CUNNINGHAM,**       )    Chapter 13
                                        )    Case No. 11-32684
                Debtor.                 )
_____)

**ORDER OVERRULING OBJECTION TO CONFIRMATION OF CHAPTER 13 PLAN**

**THIS MATTER** came on for hearing on February 14, 2012, on the Objection to Confirmation of Chapter 13 Plan ("Objection") of World Omni Financial Corp. ("World Omni"). World Omni objects to the provision of the Debtor's plan that bifurcates its secured claim. According to World Omni, the Debtor cannot bifurcate its claim due to the treatment of purchase money security interests under the "hanging paragraph" of 11 U.S.C. § 1325. The hanging paragraph forbids bifurcation of debts secured by purchase money security interests in motor vehicles purchased within 910 days of a debtor's bankruptcy filing. The court overrules the Objection because, to the extent World Omni has a purchase money security interest in the Debtor's vehicle, it was granted far more than 910 days prior to the filing of

this case.

**BACKGROUND**

1. In December 2006, the Debtor purchased a new 2007 Toyota Camry from Toyota of Gastonia on credit. The parties memorialized their agreement with a boilerplate retail installment sale contract ("First Contract"). The First Contract recounts that the Debtor financed the purchase price of $34,924.70 at 9.89% and calls for 84 monthly payments of $580.18 beginning in January 2007. In the First Contract, Toyota of Gastonia assigns its interest to World Omni without recourse. This transaction occurred almost five years prior to the filing of the Debtor's bankruptcy petition. World Omni noted its lien on the vehicle's Certificate of Title in January 2007.

2. When the Debtor subsequently began having trouble making the monthly payments, she repeatedly contacted World Omni to inquire about refinancing the debt. World Omni initially told the Debtor it did not refinance its customers' loans and directed the Debtor to seek refinancing from another lender. When the Debtor informed the creditor of her loss of employment in April 2010, however, World Omni's reluctance to refinance disappeared. World Omni contacted the Debtor and offered her more favorable terms on a new loan, which the creditor described as refinancing.

3. World Omni mailed a new contract to the Debtor that she signed and returned. The new contract ("Second Contract") is a

boilerplate retail installment sale contract that is very similar to the First Contract. The Second Contract, by its terms, reflects the sale of a used 2007 Toyota Camry (with the same vehicle identification number as the vehicle sold to the Debtor under the First Contract). The Second Contract finances $21,854.54, the exact amount the Debtor owed under the First Contract at the time, at 3.9% and calls for 72 monthly payments of $340.92. The Second Contract is dated March 28, 2011, 210 days before the Debtor filed bankruptcy.

4. One car is the subject of both the First Contract and the Second Contract. That car was never out of the Debtor's possession after December 2006; she never turned it over to World Omni, Toyota of Gastonia, or anyone else. When the Debtor and World Omni entered into the Second Contract, the Debtor did not go to a dealership, have a selection of cars to choose from, or get to negotiate the price.

## ISSUE

5. Does the "hanging paragraph" of 11 U.S.C. § 1325 apply to World Omni's claim against the Debtor?

## ANALYSIS

6. In a Chapter 13 bankruptcy case, a debtor must pay a secured creditor's "allowed secured claim" in full. 11 U.S.C. § 1325(a)(5); <u>In re Price</u>, 562 F.3d 618, 623 (4th Cir. 2009). Section 506(a)(2) of the Bankruptcy Code ("Code"), 11 U.S.C. §§ 101–1532, however, limits the amount of a creditor's allowed

3

secured claim to the replacement value of the collateral at the time of filing. 11 U.S.C. § 506(a)(2). If the debt owed to a secured creditor is greater than the value of the collateral, the Code bifurcates the debt into a secured claim for the value of the collateral and an unsecured claim for the remainder. § 506(a)(1); Tidewater Fin. Co. v. Kenney, 531 F.3d 312, 316–17, 320 (4th Cir. 2008). While the Code requires the debtor to pay the secured claim in full, the debtor can partially pay the unsecured claim along with his other unsecured debts. Tidewater, 531 F.3d at 321; In re Trejos, 352 B.R. 249, 253 (Bankr. D. Nev. 2006) (noting in addition that this treatment of undersecured claims emulates their treatment under non-bankruptcy law).

7. For bankruptcy cases filed prior to October 17, 2005, section 506 applies to all personal property collateral. Among the many changes to the Code instituted by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-8, 119 Stat. 23, for cases filed on or after October 17, 2005, was the addition of the "hanging paragraph" to section 1325.[1] As a result of the hanging paragraph, debtors can no longer bifurcate certain secured claims and must pay them in full with interest. The hanging paragraph provides:

> For purposes of paragraph (5), section

---

[1] The "hanging paragraph" takes its name from the fact that, unlike most of the other paragraphs in the Code, it is unnumbered. Despite the fact that it modifies section 1325(a)(5), it is located between sections 1325(a)(9) and 1325(b)(1).

4

>506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day period preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor, or if collateral for that debt consists of any other thing of value, if the debt was incurred during the 1-year period preceding that filing.

8. In determining whether a car creditor's claim qualifies to be treated as fully secured pursuant to the hanging paragraph, there are four requirements: (1) the claim must be secured by a purchase money security interest ("PMSI"), (2) in a motor vehicle, (3) acquired for the personal use of the Debtor, (4) within 910 days (or just under 2 1/2 years) before the Debtor filed her petition. See In re Look, 383 B.R. 210, 214 (Bankr. D. Me. 2008).

9. The Debtor does not dispute that World Omni's claim is secured by a motor vehicle or that the Debtor acquired the motor vehicle for her personal use. In addition, the Debtor does not dispute that World Omni had a PMSI in her car under the First Contract. The Debtor's argument hinges on the fact that she did not acquire her car within the 910-day period prior to her bankruptcy filing.

10. World Omni argues that the hanging paragraph is applicable because the Debtor refinanced the loan during the

910-day period. Under World Omni's theory, the Second Contract represents a (second) "purchase" of the car. See Objection to Confirmation of Chapter 13 Plan at 1, In re Cunningham, No. 11-32684 (Bankr. W.D.N.C. Nov. 29, 2011) ("On March 28, 2011, Debtor *purchased* . . . a 2007 Toyota Camry . . . .") (emphasis added).

11. The Code does not define the term "purchase" or the concept of a "purchase money security interest."[2]  "When determining the substance of property rights and security interests in bankruptcy, 'the basic federal rule is that state law governs,' " Price, 562 F.3d at 624 (quoting Butner v. United States, 440 U.S. 48, 57 (1979)), so the court looks to state law, in this case the General Statutes of North Carolina, for guidance.

12. North Carolina's version of the Uniform Commercial Code ("UCC") defines "purchase" as "taking by sale, lease, discount, negotiation, mortgage, pledge, lien, security interest, issue or reissue, gift, or any other voluntary transaction *creating an interest in property*." N.C. GEN. STAT. § 25-1-201(b)(29) (emphasis added); see also N.C. GEN. STAT. § 25-2-106(1) ("A 'sale' consists in the passing of title from the seller to the

---

[2] The Code does define "purchaser." See 11 U.S.C. § 101(43) ("The term 'purchaser' means transferee of a voluntary transfer, and includes immediate or mediate transferee [sic] of such a transferee.")  While the court finds that this definition is primarily intended for avoidance actions, see, e.g., 11 U.S.C. §§ 547, 548, and does not decide the instant dispute, the court notes that this definition does not support World Omni's position, as World Omni did not transfer anything to the Debtor when she signed the Second Contract.

6

buyer for a price."); BLACK'S LAW DICTIONARY 1354 (9th ed. 2009) (defining "purchase" as "[t]he act or an instance of buying"); id. at 1454 (defining "sale" as "[t]he transfer of property or title for a price").  The concept of a "purchase" does not appear to be broad enough to encompass the transaction represented by the Second Contract.  The Second Contract did not create an interest in property; the First Contract did.  The Debtor bought the car in the transaction memorialized by the First Contract and could not purchase under the Second Contract property that she already owned.  See In re Matthews, 724 F.2d 798, 800 (9th Cir. 1984) ("The Matthews did not use the loan proceeds to acquire rights in or the use of the piano or stereo. They already owned them.").

13.    Similarly, North Carolina's interpretation of PMSIs does not include the Second Contract transaction.  The North Carolina statutes do not define "purchase money security interests"; instead, two related terms are defined.  "Purchase-money collateral" is "goods or software that secures a purchase-money obligation with respect to that collateral," while a "purchase-money obligation" is "an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor *to acquire rights in or the use of the collateral* if the value is in fact so used."  N.C. GEN. STAT. § 25-9-103(a) (emphasis added).  The Debtor could not "acquire rights in or the use of the collateral" through the

7

Second Contract because she had already acquired the rights and use under the First Contract. See Dominion Bank of the Cumberlands, NA v. Nuckolls, 780 F.2d 408, 413 (4th Cir. 1985) ("It is not a purchase-money lien, because it secures a loan made to refinance a pre-existing debt—not to acquire the collateral."); Matthews, 724 F.2d at 800 ("The new security interest in the piano and the stereo taken by Transamerica at the time of the refinancing was therefore not a 'purchase money security interest' as the Code has defined it."); In re Jones, 5 B.R. 655, 656 (Bankr. M.D.N.C. 1980) ("The additional sums advanced by the renewal notes were not used to enable the Debtor to acquire rights in the collateral nor did the refinancing of the original Note enable the Debtor to acquire any additional rights in the collateral."); Richard H. Nowka, Allowing Dual Status for Purchase-Money Security Interests in Consumer-Goods Transactions, 13 TRANSACTIONS: TENN. J. BUS. L. 13, 13—14 (2011) ("If the purchase-money debt is renewed or refinanced, the resulting indebtedness is no longer a debt the debtor incurred to obtain the collateral—the debtor had the collateral before the refinancing or renewal."); Robert M. Lloyd, Refinancing Purchase Money Security Interests, 53 TENN. L. REV. 1, 2 (1985) ("A purchase money security interest is a security interest securing a loan that enables the borrower to buy the collateral.").

    14. In addition to the defined terms, other aspects of North Carolina's UCC support a definition of PMSIs that excludes

8

World Omni's theory. For example, "[t]he concept of 'purchase-money security interest' requires a close nexus between the acquisition of collateral and the secured obligation." N.C. Gen. Stat. § 25-9-103 Official Comment 3. The nexus between the Debtor's acquisition of her car in December 2006 and the refinancing in March 2011 is quite remote. Similarly, the previous version of the UCC "exclude[d] from the purchase money category any security interest taken as security for or in satisfaction of a preexisting claim or antecedent debt." N.C. Gen. Stat. § 25-9-107 Official Comment 2 (1999). While the current version of the UCC does not expressly include this statement, the definitions in section 9-103 implicitly include it. Nowka, <u>supra</u>, at 40 n.165.

15. The Second Contract does not represent a purchase and would not qualify as a PMSI under North Carolina law. Therefore, the hanging paragraph does not apply to World Omni's claim against the Debtor. If World Omni still holds a PMSI in the Debtor's car, it dates back to the First Contract in December 2006, far more than 910 days prior to the Debtor's filing date. While the court does not need to resolve the question of whether World Omni's PMSI from the First Contract survived the refinancing, the court does note that the impact of refinancing on PMSIs in this context appears to be an open question.

16. There are three competing theories for dealing with

9

PMSIs post-refinancing: the transformation rule, novation theory, and dual status doctrine. Jenna L. Fruechtenicht, Comment, "Refinanced or Modified": Is it a PMSI? An Analysis of North Carolina's PMSI Amendment, 29 WAKE FOREST L. REV. 915, 922 (1994). Under the transformation rule, a PMSI loses its purchase money status when refinancing adds new, non-purchase money debt. Lloyd, supra, at 48. Under novation theory, any refinancing makes the entire debt non-PMSI because the new agreement satisfies the antecedent purchase money debt and there is no new purchase. Nowka, supra, at 42. Application of the dual status doctrine allows a single security interest to "have purchase money privileges to the extent that the debt it secures is purchase money." Lloyd, supra, at 63.

17. The transformation rule would not apply to the instant dispute because the refinancing did not add to the original debt. See id. at 48. The Fourth Circuit has expressed disapproval of the dual status doctrine in the context of the Code and the hanging paragraph. See Price, 562 F.3d at 630 n.6 ("[I]t would be improper to partition the debt into purchase money and non-purchase money components, because Congress plainly knew how to add language such as 'any portion of' when it wished."). However, the Fourth Circuit has used novation theory. See Dominion Bank, 780 F.2d at 413. If the court applied novation theory to this case, the conclusion would be that World Omni lost its PMSI in the Debtor's car when it

10

refinanced the debt.[3]

18. North Carolina law on refinancing and PMSIs is similarly unsettled. Cases under the former version of UCC Article 9 used the novation theory, see Jones, 5 B.R. at 656, and the dual status doctrine, see In re Sherman, 126 B.R. 684, 687 (Bankr. E.D.N.C. 1987). The General Assembly of North Carolina provided additional guidance when it amended section 25-9-107 (the predecessor to section 25-9-103) in 1993 to provide that "a [PMSI] . . . will continue in the collateral when the underlying security agreement is refinanced or modified with the same creditor." See Fruechtenicht, supra, at 915. With the adoption of the new Article 9 in 2000, however, the General Assembly only retained language similar to the 1993 amendment for situations involving non-consumer goods. See N.C. GEN. STAT. § 25-9-103(f) ("In a transaction other than a consumer goods transaction, a purchase-money security interest does not lose its status as such . . . ."). Since the same statute instructs courts not to take any inference from the language of section 25-9-103(f) in consumer goods cases, N.C. GEN. STAT. § 25-9-103(h), the current version of Article 9 in North Carolina does not address the issue of the impact of refinancing on

---

[3] World Omni argued to the court that the Second Contract represented "a novation or a new contract," apparently not realizing that "the novation theory advances the idea that if a PMSI is refinanced it ceases to be a PMSI." Fruechtenicht, supra, at 925.

11

consumer goods collateral.[4]

19. Finally, the only written opinions that the court was able to locate that consider an argument similar to World Omni's flatly reject it.[5] See In re Horn, 338 B.R. 110, 113 (Bankr. M.D. Ala. 2006) ("City Finance argues that the debt was incurred at the time of the last refinancing which was well within the 910-day period prior to the bankruptcy. The debtor, on the other hand, contends that the purchase-money debt was incurred outside the 910-period in June 2001. Whether the debt was made inside or outside the 910-day period preceding bankruptcy, however, need not be reached because the court finds that the creditor is not protected by § 1325(a) for a different reason. City Finance's security interest in the debtor's vehicle is not a purchase-money security interest."); In re Naumann, No. 09-32092, 2010 WL 2293477, at *4 n.5 (Bankr. S.D. Ill. June 8, 2010) ("Shell appears to assume that the date of the loan refinancing is the controlling date for determining whether the hanging paragraph would apply to protect its claim from

---

[4] World Omni reads sections 25-9-103(f) and (h) as supporting its argument in this case. In addition to ignoring section 25-9-103(h)'s explicit instruction that 25-9-103(f) is not relevant in consumer goods cases, World Omni overlooks the fact that the statutory language does not indicate that creditors get new PMSIs in refinancing. For World Omni's argument to succeed, its PMSI needs to do more than "retain its status;" it needs to start anew, and there is no indication in the statute that the General Assembly intended that result.

[5] At the hearing on this matter, counsel for World Omni referred the court to an order entered in another case in this district as support for its position. See Order Granting Objection to Confirmation of Chapter 13 Plan, In re England, No. 11-40458 (Bankr. W.D.N.C. Oct. 19, 2011). However, the court is not persuaded by that order because it is a summary order that, on its face, is factually distinguishable from this case.

12

bifurcation. However, the vehicle was actually purchased approximately 3 years and 4 months before the bankruptcy petition was filed. Therefore, the 'debt was incurred' more than 910 days (or approximately 2 1/2 years) before the Debtors filed for relief under Chapter 13."). This court also rejects World Omni's theory that the refinancing of the Debtor's car represents a purchase.

## CONCLUSION

The hanging paragraph evidences Congress's intent to give additional protection to car creditors whose loans were made within 2 1/2 years of the debtor's bankruptcy filing and, by omission, not to give similar protection to car creditors with loans that are older as of the filing date. See Price, 562 F.3d at 629 ("The provision in this case is a narrow one: protecting a particular debt held by a particular class of creditors in certain narrow circumstances."). In seeking to have the court sustain its objection, World Omni asks the court not to look beyond the misleading terms of the Second Contract, but to do so would require the court to put its head in the sand and ignore the realities of the situation. See In re Pendergrass's Will, 112 S.E.2d 562, 566 (N.C. 1960) ("Equity regards substance, not form, and is not bound by names parties give their transactions.").

Accordingly, the Objection is **OVERRULED,** and the Debtor's Chapter 13 Plan is **CONFIRMED.**

**SO ORDERED.**

| | |
|---|---|
| This Order has been signed electronically. The Judge's signature and Court's seal appear at the top of the Order. | United States Bankruptcy Court |